(157 App. Div. 819.)

HERMAN v. CITY OF BUFFALO et al.

(Supreme Court, Appellate Division, Fourth Department. July 8, 1913.)

1. MUNICIPAL CORPORATIONS (§ 857*)—TORTS—NUISANCE—BUILDING—DEFECTIVE FOUNDATION.

Plaintiff's intestate, an employé of a contractor doing the superstructural work on a building for the defendant city of Buffalo, was working on the roof of same when it collapsed, causing his death. The collapse was due to an insufficient foundation. *Held* that, in order for plaintiff to recover on the theory that the foundation was a nuisance, the foundation must have been so obviously dangerous and of such a character as to render the structure a menace and an impending danger to persons in the enjoyment of their legal rights.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1812; Dec. Dig. § 857.*]

2. MUNICIPAL CORPORATIONS (§ 857*)—FINDINGS—SUFFICIENCY OF EVIDENCE.

Evidence in an action for the death of an employé of a contractor who was doing the superstructural work on a building for the city of Buffalo, caused by the collapse of the building, *held* to sustain a finding that the foundation was so insecure and dangerous as to constitute a nuisance.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1812; Dec. Dig. § 857.*]

3. APPEAL AND ERROR (§ 216*)—OBJECTION BELOW—SUFFICIENCY—INSTRUCTIONS.

Where a party was an agent of defendant in some respects, though not in all, a charge that he was the agent of defendant was not available error, where there was no request by defendant to limit the charge.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 216;* Trial, Cent. Dig. § 627.]

4. MUNICIPAL CORPORATIONS (§ 847*) — TORTS — DEFECTIVE BUILDING — NUISANCE.

The contract between the city of Buffalo and the principal contractor for the erection of a building provided that the principal contractor could not sublet the work without the consent of the city. The principal contractor did sublet the contract for roofing without such consent. An employé of the subcontractor was killed when the building collapsed because of a defective foundation. *Held* that, whether the city had formally given its consent or not, as the employé was there with the knowledge of the officers of the city, it would be assumed that he was rightfully there, and with their implied invitation, so as to render the city liable for its negligence whereby he was killed.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1803; Dec. Dig. § 847.*]

Foote, J., dissenting in part.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Trial Term, Erie County.

Action by Louise M. Herman, administratrix, against the City of Buffalo and others. From a judgment in favor of plaintiff, defendant City of Buffalo appeals. Affirmed.

Argued before KRUSE, P. J., and ROBSON, FOOTE, LAMBERT, and MERRELL, JJ.

George E. Pierce, of Buffalo, for appellant
Charles L. Feldman, of Buffalo, for respondent.

KRUSE, P. J. The plaintiff's intestate was at work upon the roof of the new pumping station engine house, which was being constructed for the city of Buffalo. The building collapsed, and he was killed. The accident occurred June 30, 1911, and the building was nearly complete when it fell. The action is for his death; it being contended that the building was obviously insecure and dangerous and a nuisance. Several contractors and subcontractors who did work upon the building and the architect who planned it were joined with the city as parties defendant. At the close of the plaintiff's case, motions for a nonsuit were made by the various defendants and denied, with exceptions to the rulings. No further evidence was given on behalf of the defendants, and the case was submitted to the jury, with the result that a verdict was rendered against the city, but as to the other defendants verdicts of no cause of action were rendered. The city appealed from the judgment entered upon the verdict against it, and from an order denying its motion for a new trial.

It is contended that the building fell because the east foundation wall of the building was not sufficiently strong nor secure to withstand the lateral pressure against it; that the wall was crowded inward, carrying with it the superstructure sufficiently to weaken the trusses which supported the roof; that the trusses were put out of alignment, and bowed or buckled, and the lower chords put out of tension, thus weakening the trusses, so that they were unable to carry the load which was put upon them, and the roof fell, and the building collapsed. The land upon which the building was located was a part of the park system of the city. The park commissioners consented to the erection of the pumping station thereon, as they were permitted to do (Laws of 1905, c. 111), and named Robert A. Wallace as architect and superintendent of construction for the building. He was so recognized by the commissioner of public works and acted in that capacity.

Wallace was made a party defendant; but, as has been stated, a verdict was rendered in his favor, and the plaintiff does not now claim that the verdict of the jury against the city is founded upon the incompetency of the architect or the insufficiency of the plans made by him. It is, however, contended by the plaintiff that the Wallace plans were not followed; that Samuel J. Fields, the assistant engineer in the water department, was placed in charge of the foundation work, and the work done under the direction of the department of public works, and in such a way that the building was insecure in the respect to which I have called attention.

The work of constructing the foundation was let to the Buffalo Dredging Company in August, 1907. The work was commenced in the spring of 1908, and finished in the fall of that year. The site extends to the shore line of Lake Erie. The ground, or a part of it, was originally low and under water. The site was dredged and excavated to within two feet of bed rock, where a layer of hardpan was encountered. Trenches were dug for the foundation wall through the hardpan, so that the walls rested upon the rock, but were not imbedded in the rock or keyed. The building was rectangular in form, 364 feet by 100 feet. The east foundation wall, the one which became insecure, was 364 feet long, 38 feet high, 5 feet wide at the base, and 3 feet at the top; the slope of the wall being on the inside. The original plans contemplated concrete foundations for two portico entrances on the east side, one near the south end, and the other near the north end. These portico walls were to connect with the east wall and extend down to the rock; but they were omitted, and piles were driven in their stead, to which I will again advert.

After the foundation work was completed, and had been accepted and paid for by the city, the work of filling in the site outside of and around the walls was commenced by the city in the winter of 1908 and 1909, under the immediate supervision of the assistant engineer in the water department. The first filling consisted of ashes, cinders, and the like material, which had been gathered by the city street-cleaning contractor. The work was continued until the filling east of and next the east foundation wall was up about 20 feet. Then the pit or excavation inside the walls was filled with broken stone and earth up to the same height. Thereafter a second filling of about 14 or 15 feet, consisting of earth, was placed on top of the first filling, next to the east foundation wall, and extending to within a foot of the top of the wall. The filling was finished late in 1909, and the work was left in that condition until the spring of 1910, when it was noticed that the east wall was being deflected inward and westward, evidently due to the lateral pressure of the outside fill. Cracks about a half an inch wide running through the wall, about 6 feet from either end, were discovered. Measurements were made in February, 1910, showing a maximum deflection of 6 inches, 150 feet south of the north end; the wall bending toward the west, commencing at the crack at either end of the wall. Within a month or so several other measurements were taken, which disclosed that there was an increasing deflection of the wall. Thereupon the matter was taken under consideration by the assistant engineer and the commissioner of public works and his deputy, and a plan adopted for holding the wall in place by means of buttresses or braces placed on the inside of the wall. Twenty or more of these buttresses, consisting of concrete, each weighing about eight tons, were placed against and attached to the wall on the inside, resting in and upon the broken stone filling in the pit, and secured by a mat or floor of concrete. But it is claimed that the buttresses should have extended down through the broken stone and been imbedded in the rock; that after a time the broken stone filling settled,

so that they were simply hanging to the wall. Whether that is so or not, the proof tends to show that the wall was not held in place.

With the foundation in that condition, the work was turned over to the B. I. Crooker Company, who had taken the contract for the superstructure. Although the contract was let in July, 1909, their work was not commenced until the spring of 1910. A short time after the work of erecting the superstructure had commenced, 15 piles were driven to the bed rock about 3 feet outside of the east wall near the north end, and a like number near the south end, for the portico entrance foundations. The work was done under a separate contract made by the city with a contracting firm and in accordance with the plans prepared by the assistant engineer. This work, like all of the foundation work, was done under the direction of the assistant engineer.

The iron frame of the building consisted of 23 double posts or columns on the east wall and as many on the west wall, 14 feet 8 inches apart, one longer than the other; the longer ones carrying the roof trusses and the shorter ones a track for operating a traveling crane. The ends of the building were brick walls, and the east and west walls were of brick and terra cotta, forming a so-called curtain wall. From the peak or ridge of the building, about 200 feet long, was erected a lantern or skylight of iron and glass, attached to the upper chords of the trusses, extending about 10 feet either side of the peak, the purpose of which was to allow the steam and smoke to escape and to admit light and air. Extending lengthwise of the building purlins were riveted to the trusses. The roof was of reinforced concrete, on top of which tile was being placed at the time the building collapsed, on the 30th day of June, 1911.

It is also claimed that changes were made in the superstructure, which weakened the building, especially in the trusses, and that they were overloaded; but the most that can be claimed for those things is that they contributed to the accident, if the conditions respecting the east wall were as the plaintiff claims and as the jury evidently found. The verdict rests essentially upon the finding that the foundation was insufficient and insecure at the time the work was turned over to the contractors for the superstructure, and that the insecurity and danger increased as the work progressed, finally resulting in the collapse of the building. Upon that question the city attorney asked the court to charge the jury that, although they found that there was a deflection of two inches in the east wall after the building of the buttresses, if the city, through its officers, in the exercise of ordinary care, did not know of such movement, but that its officers believed that the building of the buttresses would prevent further movement, the city is not responsible or liable for creating or maintaining a nuisance, and that the jury must render a verdict of no cause of action in favor of the city; counsel adding, after a colloquy between himself and the court, "If they use reasonable care," to which the court replied: "Reasonable care. I so charge."

It may also be stated, in passing, that the basis of making some of the contractors and subcontractors parties defendant is, in brief, that

they, having knowledge of the insecurity of the foundation, proceeded with their work, and thereby further weakened the foundation and enhanced the danger, upon the principle that whoever participates in the construction of any structure which is obviously dangerous to human life is a party to the creation of a nuisance. But, as has been stated, the jury exonerated them from fault.

[1] The judge, in his charge to the jury, after stating the principle which I have just mentioned, continued by saying that the structure must, however, be so threatening as to constitute an impending danger to persons in the enjoyment of their legitimate rights; that the plaintiff, in order to recover against any defendant in this action, is bound to show by evidence to the satisfaction of the jury that there was some defect in such defendant's work, which as a reasonably prudent man he knew, or should have known, was of such a character as to render the structure a menace or danger to human life, one that was obviously dangerous to human life, one so threatening as to constitute an impending danger to persons in the enjoyment of their legitimate rights. The rule thus laid down by the learned trial judge for determining the defendant's liability is as stated in Cochran v. Sess, 168 N. Y. 372, 61 N. E. 639, and almost in the identical words of Judge O'Brien, who wrote for the court in that case.

In Melker v. City of New York, 190 N. Y. 481, 83 N. E. 565, 16 L. R. A. (N. S.) 621, 13 Ann. Cas. 544, the question of what constitutes a nuisance is discussed at length, and the definition of a nuisance as there stated, applicable to the circumstances of that case, is that, if the natural tendency of the act complained of is to create danger and inflict injury upon person or property, it may properly be found a nuisance as a matter of fact; but if the act in its inherent nature is so hazardous as to make the danger extreme, and serious injury so probable as to be almost a certainty, it should be held a nuisance as a matter of law. That definition was reiterated, and the rule applied, in the case of Hogel v. Franklin Mfg. Co., 199 N. Y. 388, 92 N. E. 794, 32 L. R. A. (N. S.) 1038.

It is true that the defendant's negligence lies at the foundation of this action, but the nature of the action is one essentially for creating and maintaining a nuisance. As is said by Mr. Justice Woodward in McNulty v. Ludwig & Co., 153 App. Div. 206, 213, 138 N. Y. Supp. 84, 90:

"The existence of a nuisance, in many, if not in most, instances, presupposes negligence. These torts may be, and frequently are, coexisting, and practically inseparable, as where the same acts or omissions constituting negligence give rise to a nuisance."

I will not collate the cases upon the question as to what constitutes a nuisance, nor attempt to point out the limitations of the general definitions by which courts have attempted to define a nuisance. It is sufficient, I think, to say that in my judgment the rule stated to the jury was applicable to this case, and that upon the evidence the jury was warranted in finding the defendant city liable.

[2] As we have seen, the plans for the foundation were materially changed. It was soon apparent that the east wall would not withstand

the lateral pressure. The proof tends to show that according to the original plans the wall was designed as a bearing wall, not as a retaining wall, and it also appears by the testimony of experts that the wall should have been at least 12 feet wide at the base, resting in a trench in the rock, and keyed; that the filling inside should have been done simultaneously with that on the outside of the wall; that the buttresses weakened rather than strengthened the wall, because they were not firmly imbedded and secured at the base, and when the stone foundation settled they were left hanging at the side; that the driving of the piles so close to the east wall further increased the lateral pressure, while, if the concrete foundations originally planned for the porticos had been put in, they would have served to strengthen the wall and resist the pressure of this compact mass of filling—in short, that a foundation had been constructed which was insecure, and that the structure was so dangerous as to constitute a nuisance within the rules to which I have adverted.

It should be stated, however, in fairness to the city and its officers, that they contend that, if there was any fault in the plans or in the construction of the work, it was not their fault; that engineers of skill and experience were employed, and that so far as Mr. Fields, or any of the representatives of the department of public works, had to do with the work, it was not only well planned, but properly done; that the buttresses were entirely adequate, and held the east wall firmly in place; but that there were changes and omissions made in the work, for which neither the city nor its officers are responsible, which caused the collapse. However, the jury was fairly charged upon those questions, and found against the defendant city.

[3] 2. But it is contended on behalf of the city that the plaintiff's intestate was at most a licensee upon the premises, and that the city owed him no active duty to have the building or premises in any particular condition, or to do or refrain from doing any particular act, except not to willfully injure him.

It appears that the Crooker Company, the principal contractor for the superstructure, subcontracted the sheet metal work and roofing to G. H. Peters Company, and the plaintiff's intestate seems to have been doing his work under some arrangement with the Peters Company. He had several men working with him, slating the roof of the building, when it collapsed. It is urged that, under the terms of the contract between the Crooker Company and the city, the Crooker Company could not sublet the work without the consent of the city. The record is silent upon the question as to whether the city consented or not. But, whether the city formally gave its consent or not, I think we may fairly assume that he was rightfully there, engaged in doing his work, furthering the completion of the building, and that the work which he was doing was included in the general contract between the Crooker Company and the city; that the city, through its proper officers, so recognized his status; and that at least he was there by the implied invitation of the city. Under such circumstances I think the city is liable for his death, assuming, of course, that the other necessary facts have been established.

3. Measurements were made after the collapse of the building, showing that the east wall had moved several inches westward after the work on the superstructure was begun, and it is claimed it was error to show this. It is urged that there is no presumption that the wall was not disturbed by the collapse of the building. I think, however, the circumstances were such that it could be found that the location of the wall was not changed by the collapse of the building.

[4] 4. It is further urged on behalf of the defendant city that the trial court erred in instructing the jury that Wallace, as superintendent of construction, was the agent of the city. I deem it sufficient to say that I think the charge was correct. It is possible that he may not have been the agent of the city in all that he did in the way of planning and superintending the works, and to some extent he may have exercised independent judgment; but in some respects, at least, it would seem that he was the agent of the city. If counsel desired to limit the charge in any way, that should have been done by an appropriate request. Furthermore, I do not see how it could affect the result, because the jury found Wallace was not at fault.

There are other exceptions to the charge. They have all been considered, but I think they are not well taken. I think that no error was committed which would justify the granting of a new trial.

I therefore reach the conclusion that the judgment and order appealed from should be affirmed, with costs. All concur except FOOTE, J., who dissents, upon the ground, first, that the plaintiff's intestate was a bare licensee, for whose injury the defendant city would not be liable, because of a nuisance upon its private property; second, that the evidence does not support the theory on which alone the verdict rests, viz., that the collapse of the building was due to the defects in the foundation wall.